Okay, we call our next case Zenergy vs. Performance and we'll hear from Mr. Taylor. I'm Glenn Taylor and Ms. Sparks and I are here today representing Zenergy. I'd like to address the contract interpretation issue because we submit that if our interpretation is correct, this case must be sent back for a retrial if the breach of contract claims that both parties asserted and that we actually tried. At issue is the responsibility for 23 days of day work drilling during which Performance did not drill the vertical well that was contracted to drill, it did not drill the well that it was directed to drill, and it did not drill the well that it was reporting to Zenergy that was drilled, which was a vertical hole. It's undisputed that although Performance reported on multiple occasions on the standard form IEDC daily drilling report that it was drilling a vertical hole that was within 5 degrees of vertical as required by Louisiana law, that it in fact was drilling a well that ended up 20 degrees off true vertical, 1145 feet, almost full of football fields from where it was supposed to bottom, completely off the unit and completely off the leads. If you look at record exhibit, record excerpt 8 has some demonstrations that were shown to the jury which demonstrate the extent of the deviation that we did not request. Now, our position is the contract does not give Performance an absolute right to be paid for those 23 days. I noted in the brief filed by Performance they are attempting to characterize the contract that we had as a lease, as in we leased the drilling rig, we leased some personnel, and we had complete control over them. The contract itself, and the court may be familiar with these IEDC contracts, they change over time. It does not use the word lease. It clearly calls for Performance to act as an independent operator to drill a well under our direction, and they have conceded in their brief that we discussed drilling a vertical well, we contracted to drill a vertical well, we directed them to drill a vertical well, and we didn't get one. The contract not only does not give them an absolute right to be paid, but it does not make Xenergy, the operator, strictly liable, which is their argument, without regard to whether or how Performance performed its stated obligations under the contract. And the ones that matter are fourfold. Drill a vertical well, under paragraph three. Comply with the Louisiana law that pertained to their operations, which is undisputed. Stay within five degrees of vertical. That's the permit we have. Thirdly, give us accurate reports of the work that's being performed on the IEDC report. And as part of the record excerpt, you will see that they might be reporting a one degree variation that was actually ten degrees, a 1.7 degree variation that was 17.5 degrees, and ultimately a one or two degree that was off 20 degrees. The reports were not accurate. Finally, they have an obligation under the contract to provide the drilling rig, the equipment, including this conventional drift indicator, which we call the Directional Drilling Survey, and personnel. I think that the principle contract interpretation issue concerns what we sometimes call the carve-outs. It's the two except for and except as. On the first page of the contract, in the first unnumbered—sorry, first page, the second unnumbered paragraph, contractor—I'm paraphrasing—contractor assumes only the obligations and liabilities herein stated, except for such obligations and liabilities specifically assumed by contractor. We are responsible. Now, I've just read off four things that they're required to do under that contract. Paragraph 14.13, that has been the center of much of the briefing and arguing, begins, except as otherwise expressly ended in the contract, it's the intent of the parties here, too, that all releases, indemnity obligations, and liabilities assumed by such parties under the terms of the contract shall be without cause. So that language, it means something, and it's in there for a purpose. And I admit that this form can be confusing, but that override language, the except as and the except for, is there for the purpose of making it clear that paragraph 14.13 does not negate nor does it override the stated obligations that they have, those four that I gave you. Now, I look back at performance's brief and the argument that they have made about paragraph 14.13. They do not cite a single case that has endorsed that view of 14.13, or their view that they have an absolute right to be paid and that we are strictly liable under the terms of the contract, without regard to performance. We dug and we provided the court with two cases that may be the only two cases I've been able to find that have addressed this. The Casa drilling case from California Appellate and the Sonera case, which is a Texas District Court case. We provided those to the court. They stand for the proposition that 14.13 indeed does not override or negate specific obligations that the driller has undertaken. That except for and except as means something. That this contract is not illusory as to their obligations. So, on the contract interpretation issue of these carve-outs, we take the position performance does not have an absolute right to be paid without regard to how they perform, to whether they perform. Xenergy has a right to raise their breach of contract as a defense. That's specifically addressed by the Casa drilling case. The court took it on and said that if they have breached 14.13, it does not prevent the contractor from asserting that as a defense. In my view, that's a basic principle of contract law. Now, what about subparagraph 14.5? 14.5 is the provision that deals with in the event the hold should be lost or damaged. Now, that is a—our position is that's a technical term in the industry. Louisiana law endorses the principle that if you're dealing with technical terms in a technical contract, then you're entitled to find out how does the industry interpret that. And we take the position that that's an ambiguous term. It's not defined in the contract. The testimony was that a lost or damaged hold means things like you're drilling along, the hold collapses. You're drilling along, the pipe gets stuck. You're drilling along, there's an underground explosion or a kick or something like that that prevents you from using that hold. What they gave us was a perfectly good directional deviated hold that we didn't ask for.  It wasn't lost or damaged. But that's a factual—that's a factual issue. They took the position that they put on testimony it was a lost or damaged hold. We pointed out they never reported this as a lost or damaged hold. So I think at the end of the day, under Louisiana law, you've got an issue about what does that phrase mean. It's not defined. It is ambiguous. I think you're allowed parole testimony to find out how does the industry view that. Well, those are pretty plain words, though, and I think they're a pretty good argument. Under a plain meaning, this was a damaged hold. Well, this is a technical contract. I don't think it was—no, it wasn't a damaged hold, Your Honor. I mean, it was not a useful hold for us. No pipe got stuck. No tools got dropped in it. There were no fishing expeditions. The hold was worthless, do you mean? Well, if the contract said worthless or the contract said useless or the contract said unrequested but the phrase lost or damaged hold in this trade, in this business, has a technical meaning. Like fishing, if the contract said if you have to go on a fishing expedition, but the contract said there's a kick. Those aren't—you can't—I don't think you can take a sophisticated, complicated form contract that's used in one industry. This is not used for construction contracts or other things. This is specific to the oil and gas drilling industry. That phrase has a technical meaning in the business. You can't just run the Merriam-Webster's Dictionary and say, aha, something in these words means that if I drill you a hole you didn't ask for  I know where it is. There's no evidence it was damaged. It was just not the hole we asked for. So we think that we've got a paroled evidence expert testimony issue fact on that for the jury, which we presented. Both sides did. In addition to the— You don't have any case law that supports you on that, do you? Yes, sir. We cite on the definition of that phrase. No, that hasn't. But, for example, we cite some Louisiana cases where they talk about a metering station. What does that mean? And we have a Louisiana article that—Louisiana Article 2047, words of art in technical terms must be given their technical meaning when the contract involves a technical matter. And I think nobody would disagree this contract involves a very technical matter, drilling a well to 10,000 feet using what were supposed to be sophisticated tools and equipment. This is not your run-of-the-mill buying something off the shelf. If I may, Your Honor, in addition to the express stated obligations that performance had, we think that the Louisiana law implies a standard of performance. Now, performance is taking the position that they had no standard of performance under the contract. We had to pay—if they showed up and did any work, we had to pay for it, regardless of how they performed it. That means if they could show up with a worn-out drilling rig, malfunctioning equipment, an incompetent staff, and their position is, you have no recourse, that would be truly an illusory contract. We think that because they had the stated obligation to provide the drilling rig and certain equipment, which included this directional tool, they clearly had that obligation. And the contract is silent as to whether there is a standard of performance. I noted that in their brief they cited a Tulsa Law Journal article that was written back in 1990 reviewing what were then drilling contract forms. That article conceded that this IEDC contract, type of daybore contract, states no standard of performance, but that a court could well imply a standard. And I think that's where we are in Louisiana law under Article 2054. If they had the stated obligation to provide the drilling rig, the equipment, and the crew, our position is that they had the implied obligation to provide drilling rig, equipment, and crew that were in proper working order, people that knew what they were doing, and tools and equipment that worked. And we have an issue about this directional drilling tool. There was ample evidence from which the jury could find out, could determine, that something went wrong with their sure shot tool, and that's a jury issue. I'm content with that. We had a back and forth on that. But without that implied standard of performance, their argument is we can do whatever we want to until you fire us. Unless you fire us, you have to pay us. And I don't think that that's what this contract calls for. Well, we've got to take the directions of your company man out there, though. Absolutely. And it's undisputed in this record, we never instructed them to drill anything other than a vertical hole. But I thought your people told them what assembly to use at the bottom of the rig, and told them when to take the deviations, and looked at the measurements. That's correct. Our instructions were in the testimony is this. Every thousand feet, we instructed them to take a directional drilling survey to check the angle of the well. We had nothing to do with the actual performance of that. They owned the tool that was used. Our company man was on location looking at a monitor. He would issue instructions, take a directional drilling survey, but he had nothing to do with that. And the results came back that we were staying within 5%. He believed them, and that was what was reported on the report. So he was there to direct them to drill the well as a vertical hole. They conceded that in their brief. They conceded we contracted for, asked for, directed, instructed a vertical hole. That was never contradicted, even to the jury trial. No evidence of that. They say notwithstanding that, that there's just something about this contract that makes us absolutely, strictly liable to pay them with that regard to whether they performed those four stated obligations I'm focused on in a good and workmanlike manner. We have the 15B2 error. I think if the court agrees with our interpretation of the contract, the case has to go back, as you're aware. After two weeks of trying the case, a week after the close of argument, the district judge announced that we were going to the jury on a claim of intentional misrepresentation. Both sides came out of their chair objecting to that. There had been no evidence of any. There had not even been the word misrepresentation used in the trial. I did a word search of the record. The first time anybody said that was when the district judge announced that he just thought we're going to. So it was a difficult moment to try to. We had never argued that they intended to deceive us. I mean, how did you get harmed by that? You weren't on that issue. Well, we weren't on that issue, but we weren't on the issue on the jury version. Did performance fail to give us accurate reports? Yes, that's the breach of contract. But then we were held to this heightened standard of proof. Did they do it with an intent to deceive? And we never argued that. On a breach of contract claim, I don't have to inquire about intent or anything if I'm asserting a tort claim. The judge didn't charge that on the breach of contract issue, did he? No, he wouldn't let us. He took that away and just said go to the jury on a tort claim, which just left us twisting in the wind. Thank you very much. Okay, Mr. Sanders. Thank you, Your Honor. Please correspond, Sanders, with performance. I would like to start by responding to Judge Davis's question about the definition of loss or damages. In one of the cases that the plaintiffs cited in their supplemental made to the court earlier this week, Scenario Resources Corp. v. H&P International Drilling, in that case the court used the Oxford American Dictionary to look up the definition of the word damage, and the court said that damage means something that impairs usefulness. Well, that's essentially the same definition that we gave the court in our brief. We used the Random House Dictionary. But it defines damages as injury or harm that impairs usefulness. The key word is use, usefulness. It defines lost as not used to good purpose. Skip Brown is the president of Xenergy. He testified on direct for Xenergy that deviated home had no use for Xenergy. He's following the text, the dictionary definition of loss or damages. Scott Adame, the Xenergy engineer, testified that a lost or damaged hole means you can't use the hole. And that's why we get back to paragraph 14.5. This was, in ordinary language, a lost hole. There was 23 days' worth of lost drilling on that hole out there, and we're entitled to be paid for it. Now, the big issue, the real issue in this case, of course, is contract interpretation. That's for the court, and I'll answer questions on that. But the big fact issue in this case was put, it was listed as an issue by us, whether performance did anything to mislead Xenergy about the deviation measurements that were had. And that was a big issue as far back as discovery in this case. And a good part of the trial was dedicated to that issue. The only proof in the record shows that we would bring the measuring tool up. We would take it over to the company man. It was his hole, and we would show him the little disc that gets tapped for a measurement, and he would tell us what to write down. It's his hole. He tells us, he reads, he makes the official reading of that disc, and he says write down one degree, write down two degrees. Well, at some point, it became obvious. Our guys could see the disc also, and it only had seven concentric rings, so it goes to seven degrees. If it hits only the seventh ring, well, you know you're at least at seven and maybe more. That's what our guys call off the charts. We knew we had, we could look at the disc, and we could see that we had readings that were off the chart, but the company man said no, record it as one or two. And this is the fact question that Judge Wingate gave to the jury. The jury questionnaire was designed to figure out did we mislead or did we give them correct information, and they told us to report, and the key word is report, and he told us what readings to report. And that's what the jury decided. The jury said that yes, we gave, the reports that we gave were incorrect. If you look, here's the first question in the interrogatory. Do you find that Xenergy has shown by proprietary survey evidence that, let's see, that performance gave inaccurate data, information to Xenergy in the form of survey disc or daily drilling reports? Well, we can see that the reports weren't correct. That wasn't a true issue. They weren't correct because Xenergy told us what to write down, and then the next question was essentially, well, was performance trying to mislead Xenergy? That's the question of who was telling who what the reports should be, and the jury found against Xenergy on this point. Now, on the issue of whether there was a claim for misrepresentation, the reality is that Judge Wingate referred to this as misrepresentation. I think that was probably a poor choice of words. It was simply a fact question, a fact question that was in the pretrial order. Who was responsible? Who told who what to report on the deviation? And if this had simply, if Judge Wingate had simply said, well, I'm going to give this an auditory on that fact question, there wouldn't be any question about a Rule 15 view claim or not because it's simply a fact issue that was listed in the pretrial order. So I don't know. And beyond that, even if this is considered to be a claim, well, it's a claim that was litigated from start to finish by both parties equally. Both parties went at it. This is, again, one of the central issues of the trial. The plaintiff has, I mean, Xenergy has listed five things that I want to go down very quickly. They say we violated the contract by not drilling a vertical hole. In our brief, we, and I know the court is familiar with this, we talked about the different kinds of contracts, at least two different kinds of contracts that you can have in these sorts of operations. You can have a day work contract like we have here, or you can have a turnkey contract. And one of the plaintiff's big errors in this case, they're trying to convince the court that this, in effect, was a turnkey operation. They gave us a final instruction, go forth and drill a straight hole. And that's the last thing, that was the end of their responsibility. Well, that, if this had been a turnkey contract, that would be correct. But this is a day work drilling contract. They have their company man on the scene, the highest guy that we have out there, because they just, and I don't think I ever used the word lease, but they used our rig and our crew to drill their hole. The highest guy we have out there is a tool pusher. And tool pushers are not decision makers. We didn't have any decision makers out there. It was Xenergy's hole. They had the decision makers out there. They told us everything to do. So it is, Xenergy is the one that drilled this hole. They used our rig and our roughnecks to do it. And that's just the bottom line. Just for the sake of argument, assuming we disagreed about this and said this is an ambiguous contract provision and it's not clear, what jury findings support the verdict for you in any event? The only jury finding, Your Honor, is on the, I think it's paragraph 8.3 of the contract. It requires that my company performance be of accurate record. And the only, the jury issue only went, the jury question went to that issue. Did we report incorrectly or did Xenergy tell us to put on those reports what the deviation was? That's the only question that was actually presented to the jury. But the second issue that Xenergy pursues here is that this allegation that we violated Louisiana law. We didn't. The permits to drill, the requirements, the regulations and so forth for that drilling, they were all procured by Xenergy. They applied to Xenergy. Those permits didn't require performance to do anything. Also, this is really an argument in a vacuum. It's a completely academic issue. So far as I know, the state of Louisiana never imposed any sort of sanction against Xenergy for doing anything wrong out there. They come in and say, well, you violated state law. Well, the law applied to you. It was your permit. And there's nothing in the record that indicates that any law was violated anyway. At least Louisiana never imposed any sanction for it. So I think that's just an academic question that really is an attempt to sort of dodge the main issue here. The third thing they talked about is the incorrect deviation information. That's what the jury decided. We've already talked about that. The fourth thing they said is that we furnished a bad deviation measuring device. That's just not correct. There was testimony from one person in the trial about the tool that we used. It was our tool. And when the hole started drifting, the company man out there, Mr. Dean Dick, said, no, he just said, I don't believe it. I think the bottom hole assembly we're using cannot cause this hole to drift. You're something's wrong with your measuring tool. So we got a fellow to come out and give us another measuring tool. And then he went back and tested the first one. He said, there's nothing wrong with this. It's perfect. They got the second measuring tool out there, kept getting off-the-chart readings. Mr. Dick said, no, get another one. We got a third one out there. And they kept on getting these readings that were off-the-chart and that Mr. Dick just simply refused to believe. And he would tell our guys, write down one degree, two degrees. And one of our guys, Mr. Hawkins, and I've got a record site for this somewhere, Mr. Hawkins confronted Mr. Dick about this. He said, look, these readings are off-the-chart. And Dean Dick's response, the company man's response to our guy was, it's my hole, you're iron. You do what I tell you. And that's what he said. So we were then, okay, fine. If you want to drill a hole that's crazy, if you want to drill a hole that goes in corkscrews, it's your hole. We'll do it if you want to. I mean, that's essentially the position we were in. Do you have a jury finding that supports that? Is there a jury finding that supports that? No, Your Honor. I think that's the court deciding that, I think, that it was under. And I think the court's ruling essentially was under 1413 and 1415. 1415 says that if a hole is lost, it is the operator's hole that belongs to them, regardless of any contract issue, tort issue, or any other issue. And I think that's the basis of the court's directed verdict for us on that point. And actually on the interrogatory that is submitted to the jury, it was a final attempt sort of to help the other side out. Judge Wingate said, look, under the contract, it's clear that this is Xenergy's hole. It's Xenergy's loss. He said, but I'm going to let the jury say whether or not performance intentionally misrepresented these readings to the jury. And if performance did, then I'm going to let Xenergy win this case. And, of course, the jury came back and said, no, performance didn't mislead anybody in this. The last issue that Xenergy argues is this is about a good and working life requirement that should be implied in the contract. Paragraph 1413 expressly says that the obligations of this contract do not include any implied or obligations, that the responsibilities are assigned by this contract, and responsibilities arise on the basis of the written word, and any implied condition is not part of this contract. Your Honor, on – I don't have a whole lot I want to say, but on the issue of – I may want to cover this. On the issue of whether Judge Wingate introduced a new issue in the trial, we think very plainly he did not. He simply gave a jury instruction that could have been just simply denominated an instruction on the question of fact that we listed in the response – and even if, as an error, the right result was reached and this court should affirm on that basis, even if you find that – even if you find that Judge Wingate introduced a new claim, I don't think he did. But even so, under the contract, it's clear that it was, as Xenergy said, it's their whole – they're the ones who took the risk. And as I said in the courtroom, the trial court, they let the dice fly high on this, and I admire them for that. But it just didn't work out. The whole was lost. Under the day work drilling contract, they had an obligation to pay us $18,000 a day for every day that we drilled out there. Twenty-three of those days, it was going – the whole was going off vertical. But we were out there running. We had our guys out there every day, and they owe us for that money, and that's what Judge Wingate found. So that's all I have, Your Honor, unless you all have any questions. Okay, thank you very much. Taylor? Please, of course. The only issue that the district judge allowed to go to the jury appears at Record Excerpt 3, and it was two interrogatories. Do you find that Xenergy shown by preponderance of the credible evidence that performance gave in accurate data and information to Xenergy orally in the form of surveyed deaths, daily drilling reports regarding the degree of well-born deviation? Answer, yes. The next interrogatory is where he just took the case away from us. Do you find that performance did so with an intent to misrepresent deviations to Xenergy? The answer is no. He had converted what was a breach of contract case. Both sides asserted a breach of contract into a tort case for intentional misrepresentation with the intent to deceive. Now, go back and look at the record. I'm impressed that opposing counsel can stand up here and take a position that was entirely inconsistent with what he and I objected at the time. We both came out of our chairs when Judge Wingate announced that the only thing he was sending to the jury was this tort claim for intentional misrepresentation. I've quoted in my brief what he said about that. He said there's never been a claim of intentional misrepresentation. We joined in the course. The breach of contract case got taken away from us. And I did not hear Mr. Sanders address the effect of what I call the carve-outs, the except for and except as. The except for on page 1 in the second unnumbered paragraph. Contractor assumes only the obligations and liabilities stated herein. Except for such obligations and liabilities specifically assumed by them, we're solely responsible. Paragraph 1413, except as otherwise expressed in this contract. Now, they clearly had those four obligations and liabilities. Build a vertical home. Comply with Louisiana law on the 5%. We're not alleging a violation. They were under 8.3 of the contract. They were obligated to comply. We're not talking about a regulatory violation or getting cited by the Louisiana Conservation Commission. We're talking about a contract requirement that they comply with that 5 degree provision. The other one was to provide us with accurate reports. We won on that with the jury. But they weren't going to go a distance or a height that I didn't even ask them to go. That is fine that they do this with the intent to deceive. That had never been our argument. And, fourthly, to provide equipment and tools that are improper working under Louisiana law. Did you ask that the meaning of the word damage be given to the jury? Yes, sir. We had testimony on that, the testimony of what does this language mean in the business. Scott Adamey testified without contradiction that it meant that if a hole is lost or damaged in our industry means if there's a cave in, if the pipe gets stuck, if a tool is dropped down there and you can't fish it out, if there's some sort of an underground explosion, that's what that phrase means in our industry. And we think that that is right in line with Louisiana law. Article 2047 is discussed in our brief on when words of art and technical terms must be given their technical meaning when the contract involves a technical matter. Now, if the Louis and Louise V Circuit recognize that rule in the Lloyds v. Transco case cited in our brief, the meter station case, and my point is that if that meter station in a contract in the oil and gas business, if that is susceptible to being explained by technical terms, then the phrase, should the hole be lost or damaged, I think just falls within that. I think after you look at the contract interpretation issue, what makes more sense and what is reasonable? Does this contract call for us to lease their rig? No, it doesn't. Provision after provision calls for performance to drill the well as an independent contractor, performance to commence operations for the drilling of the well, performance to drill the well to depth. We clearly have the obligation to give them instructions and directions, and there's no issue about that. They've conceded. We told them to drill the well as a vertical hole. We asked for the directional drilling survey to be run so that we could confirm that it was being drilled as a directional well. I'd say my time has expired. Thank you, Counselor. We have your argument.